[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties intermarried on September 24, 1983 in New York, New York. The plaintiff has resided continuously in Connecticut for the last twelve years. The parties are the parents of one child, Kelsey, born April 3, 1989. The evidence indicates that this marriage has irretrievably broken down, and judgment may enter dissolving the marriage on that ground.
This was a long and difficult trial. Every claim raised was fully contested from custody to financial issues to how one of CT Page 1196 the parties should be addressed during the trial. Presentation of the evidence consumed 23 days, and required 204 exhibits and testimony from 20 witnesses.
The court must note the efforts of all counsel. Their preparation for trial was obvious not only from the number of boxes of materials they hauled into court daily but from the organized and logical presentations offered. They were most helpful in educating the court on all issues, and they are to be complimented.
The plaintiff is fifty two years old and enjoys good health. He holds a bachelor's degree in hotel administration from Cornell and a MBA degree from Columbia University. He has worked in the commercial real estate brokerage field during his career specializing in consulting as to development financing and asset acquisitions and assisting in asset management.
The defendant is forty six years old. She suffers from allergies and chronic variant asthma, but these conditions do not appear to be disabling. The defendant has a B.A. degree from Cornell in Design and Environmental Psychology. She completed course work for a master's degree from New York University in advertising and marketing. She did not get the degree, because she did not complete her thesis.
During the marriage the defendant has worked as an account executive at an advertising agency, as an interior decorator, and operated a painting finishing business. She has not performed any of these tasks in recent years and currently holds a part time job at a retail coffee shop.
The child, Kelsey, is currently eight and one-half years old. She was adopted by the parties three days after her birth. Pictures entered into evidence show an attractive youngster. She was evaluated as having superior intelligence, borderline gifted. She suffers from attention deficit hyperactivity disorder. Medication helps the condition, and the child is functioning relatively well.
Both parties appear to be bright and articulate. The plaintiff has a calm demeanor and was impressive with his frank and well measured responses. The defendant appears more intense and high strung. However, she did impress the court with her sincerity about her feelings about her daughter. CT Page 1197
Problems surfaced early in the marriage and continued thereafter. The parties saw many marriage counselors and made several attempts to improve their relationship and salvage their marriage. It seems differences in personalities and needs played major roles in the failure of this union. Each must bear some responsibility, and the court declines to assess fault to either party.
The court has carefully considered the criteria set forth in Connecticut General Statutes, Sections 46b-56, 46b-62, 46b-81,46b-82 and 46b-84 in reaching the decisions reflected in the orders that follow.
The following orders may enter.
CUSTODY
Connecticut law mandates that the best interest of the child is the standard required to be applied by the court in reaching its decision in awarding custody. The court has considered and analyzed all the evidence presented with that in mind. To say that custody decisions are gut wrenching is to state the obvious, especially when each parent has a loving, caring relationship with the child.
The dispute as to custody was referred to the Family Relations Unit of the Superior Court for a custody evaluation. The investigation was conducted by Beth Walsh, family services counselor, who completed her assignment on September 20, 1996 and filed a report as to her recommendations. (Exhibit #12) She appeared as a witness and testified at length at trial.
The court was impressed with the witness. She was articulate and furnished well reasoned responses to the many questions put to her by counsel and the court. She recommended sole custody to the plaintiff. She identified ongoing animosity between the parties, which would prevent their being able to make joint decisions involving the welfare of their child.
The counselor reported that the child has attention deficit hyperactivity disorder and needs consistency and structure in her life. It was Ms. Walsh's opinion that the plaintiff's calm demeanor and superior parenting skills would result in his provided the consistency and structured home with clearly defined CT Page 1198 behavior guidelines that the child requires. Also, significant to the witness was that the plaintiff would foster a relationship between the child and her mother and did not believe that the defendant would encourage that relationship if she were the custodial parent.
Since there was a substantial time lapse between the completion of Ms. Walsh's report, (September, 1996), and the trial date, an updated custody evaluation was ordered on June 4, 1997. Since Beth Walsh had left the employ of the Family Services Unit, the task was assigned to another counselor, Ms. Karen Kutno. She completed her evaluation on October 14, 1997. She submitted her written report, (Exhibit #46), and testified at trial.
The court was impressed with this witness. She made a thorough, well prepared presentation and offered logical and reasonable explanations for her proposals.
Ms. Kutno concluded after investigation of the situation since the report of the first counselor that the prior finding remains valid. She confirmed that there is an ongoing conflict between the parties and that the child needs a decision maker in her life. Based on her investigation, with emphasis on Doctor Sichel's psychological evaluation of the parties, Ms. Kutno recommended that the plaintiff be the parent to have that responsibility.
Although she did not dispute the first counselor's findings, Ms. Kutno recommended joint legal custody, with the plaintiff making all final decisions, to set a positive tone to encourage the parents to cooperate in matters affecting the welfare of their daughter. She also suggested primary residence to be with the plaintiff and a slightly different visitation schedule than previously recommended.
Doctor Steven Sichel, a psychologist, with the stipulation of counsel, was appointed by the court to evaluate the psychological status of the plaintiff, defendant and their daughter to determine whether evidence of psychopathology existed and whether sexually inappropriate behavior was a factor which needed to be considered in relation to this family. The doctor was requested by all counsel to refrain from making a recommendation as to preferred custodial arrangements for the child. CT Page 1199
The doctor conducted several psychological tests, interviews and observations of interaction between the parties and the child. He issued a lengthy and detailed report of his findings in July, 1996. The report was presented at trial at the time of the doctor's testimony and was admitted into evidence. (Exhibit #69) The witness testified that the child was fragile but functioning within normal limits.
The doctor was requested by the court to file an updated report due to the lapse of time between the completion of the original report and the date of trial. Doctor Sichel complied and issued an updated report in October, 1997. (Exhibit #70).
Repeating in great detail the findings set forth in Doctor Sichel's reports would serve no useful purpose. It is significant to note the following:
1. Intense mutual acrimony continues to characterize the relationship between the parties;
2. As to Mr. McManus, there is no evidence of personality disturbance, and he and his daughter have a mutually comfortable relationship;
3. As to Mrs. McManus, there is no indication of psychopathology. However, the doctor describes her as somewhat immature and as someone with a "chronic vulnerability to becoming confused and overwhelmed by life's demands;"
4. The defendant enjoys a positive relationship with her daughter but does not appear to set appropriate limits to the child's inappropriate behavior;
5. The child has not been exposed to sexually inappropriate behavior;
6. Kelsey is a child of superior intelligence who exhibits symptoms of attention deficit hyperactivity disorder. She is doing well under all the circumstances. She is strongly attached to both of her parents and feels secure with each of them.
As indicated, part of Doctor Sichel's assignment was to determine if sexually inappropriate behavior by the plaintiff had occurred. This was necessitated by the defendant's statement that CT Page 1200 her daughter had informed her that the plaintiff acted in a sexually inappropriate manner in her presence, although not by actions directed towards her.
The doctor concluded that no sexual maltreatment had occurred, and as to the claim that Kelsey told the defendant of inappropriate behavior by the plaintiff, Dr. Sichel testified that he believed the defendant fabricated the entire story.
The court finds that no sexual maltreatment of Kelsey occurred. It has reservations as to the defendant's interpretation of what her daughter may have reported to her.
Doctor Robert Kruger, a clinical child psychologist, was called to testify by the defendant. He had been retained to perform an evaluation of her psychological status and how that impacted on her parental capacities. The witness did not interview the plaintiff or the parties' child.
The doctor found no evidence of thought disorder and concluded that there was no reason to exclude the defendant from being involved in parental decision making.
The doctor reported that the defendant is a bright, capable and intense parent who is goal directed. He advised that the defendant is not disorganized, not volatile and not irresponsible. He did admit, however, that the defendant exhibits negative personality characteristics at times.
Significantly, Doctor Kruger stated that ADHD children function best with a parent who is structured, organized and reliable.
It is difficult to reconcile Doctor Kruger's findings with the testimony of several of the other witnesses, both lay and expert.
Michael Colberg, a psychoanalyst specializing in dealing with families with adopted children, was presented as a witness by the defendant. He was requested to educate the court as to the particular burdens adopted children carry with them. The court found the testimony to be interesting and informative.
Mr. Colberg advised that adopted children must deal with many psychological issues. It is difficult for them to deal with CT Page 1201 losses. The impact of divorce on a adopted child is greater than for children born of the parties. Therefore, the witness suggests that this factor should be carefully considered in a custody dispute.
Mr. Colberg did state, however, that an adopted child only feels a loss if she is not able to maintain an ongoing relationship with both parents.
A. Stephen Lanza, a marriage and family therapist, was called to testify by the defendant. Mr. Lanza was retained to evaluate the defendant to determine if she was a victim of emotional abuse, and, if so, whether the consequences of that abuse were reflected in the negative behavior of the defendant as reported by Doctor Sichel.
The witness met with the defendant and reviewed collateral material. He did not interview the plaintiff. The witness stated that he found evidence of emotional abuse and observed the negative behavior referred to by Dr. Sichel, that the defendant was manipulative, controlling and hypervigilant. Mr. Lanza attributed that behavior to be a result of the defendant's being emotionally abused by the plaintiff.
The conclusions reached by the witness were based essentially on information reported to him by the defendant. This diminished the impact of the testimony of this witness.
Several of the defendant's friends appeared to testify. Some were from her church community and one worked with her several years ago. Another had children who attended nursery school with Kelsey.
They unanimously agreed that the defendant had a caring, loving relationship with her daughter, that she was a good mother with appropriate parenting skills. The defendant was described as kind, caring, giving, intelligent, articulate, highly energetic and passionate about life. The defendant should indeed be pleased with how well she is considered by her friends.
The attorney for the child advocated that the plaintiff be awarded sole custody of the minor child, both legal and physical. She indicated that joint custody has not worked and rancor between the parties still exists. The child has special needs that require attention on a daily basis and decisions must be CT Page 1202 made in her behalf in an immediate and conclusive way.
Attorney Rosenstein suggested that as between the parties the plaintiff is better able to deal with Kelsey's problems. He provides a calm, consistent structured environment to accommodate the child's needs.
Attorney Rosenstein also recommended liberal visitation by the defendant and that the defendant be meaningfully involved in her child's life.
The court has carefully weighed all the evidence before making this important decision. The goal is to do what is in the best interest of Kelsey. Although the court is not unmindful of the impact of its decision on the parents, that consideration was subordinated to the needs of the child.
It is clear that both parties love and are concerned about their daughter. The child has a loving relationship with each, is strongly attached to both and feels secure with each of them. Kelsey, a child of superior intelligence, in addition to dealing with the special problems of an adopted child, suffers from attention deficit hyperactivity disorder. She requires a primary caretaker who is sensitive to her needs and has the temperament, interest and ability to guide her and make important decisions affecting her welfare.
The court has seriously considered a joint custodial arrangement, but has concluded that it would not work. The intensity of the negative feelings between the parties was quite apparent throughout this trial. They are only able to communicate through written messages. They attempted custody mediation before trial and it failed. They stipulated to a shared custodial arrangement in 1995, and it was not successful and required many trips to court thereafter.
The evidence indicates that the plaintiff should be the custodial parent making the important decisions affecting the welfare of Kelsey. Two family services officers recommend this, Doctor Sichel's reports support this result and it is the position of the attorney for the child. This court has reached the same conclusion.
The plaintiff is better equipped to provide consistency and structure in the child's life. He has a calm demeanor which is CT Page 1203 important to a child with ADHD. He is thoughtful and sensitive to Kelsey's needs and is more apt to make well reasoned decisions for her. He has demonstrated good parenting skills and has the ability to set clearly defined guidelines for his daughter's behavior. The court is convinced that the plaintiff has the greater ability to put the child's needs first, and to put aside the personal feelings he has about the defendant and do what is best for the child. This includes fostering a relationship between Kelsey and her mother and allowing the defendant to play an important part in Kelsey's life.
The court is hopeful that the parties do not consider this result a win-lose situation. They should keep in mind the decision was based on what is best for their daughter. Any comments made concerning the skills and personalities of the parties were not intended as criticism but as factors important in determining what is best for Kelsey.
The court did not conclude that the defendant is an unworthy parent. The court believes she loves her daughter and the feeling is mutual, and that they share a close relationship. The court further believes that the defendant wants what is best for her child. The defendant's inability to put aside her feelings about her husband, and the fact that the plaintiff's temperament and emotional stability better suit the child's needs at the present time, were significant to the court.
It is important to Kelsey McManus that her mother continues to play an important part in her life. She loves both parents and requires the interest and attention of BOTH to develop and flourish. Mr. Colberg instructed that she will experience no loss if her relationship with each parent continues.
It is expected that the defendant will be involved in Kelsey's life as she has in the past. I expect the plaintiff to assist in making that possible. A parenting plan will follow, but the parties may, by agreement, alter it to accommodate Kelsey's schedule. The court orders that the defendant be advised of all major decisions affecting the child and be given an opportunity to express her opinions and have them considered by the plaintiff.
The plaintiff is awarded sole legal and physical custody of the minor child. The defendant shall have rights of reasonable and liberal visitation. CT Page 1204
As the custodial parent, the plaintiff should be in possession of Kelsey's birth certificate and passport. The defendant shall turn those documents over to the plaintiff. The plaintiff shall furnish the defendant with a certified copy of Kelsey's birth certificate.
A visitation schedule is hereinafter set forth. It is the court's intention that Kelsey have significant periods of time with each of her parent subject to a schedule that sensibly accommodates her needs, including school and social activities.
The court recognizes it can not anticipate all possible factors to make a visitation schedule work effectively. Therefore, the court invites the parties to make adjustments in the plan set forth, but only by agreement, reduced to writing to avoid future misunderstandings. If adjustments are requested and can't be agreed upon, the parties may seek the assistance of the Family Relations Office in Bridgeport.
The defendant shall have the following rights of visitation:
a. Alternate weekends from Friday after school to Monday morning when school resumes. In the event there is no school on Monday, Kelsey shall return to the plaintiff on Monday at 4:00 p. m.; and on weekends with the plaintiff followed by no school on a Monday, visitation with the defendant shall take place from 4:00 p. m. to 7:00 p. m.;
b. Every Thursday during the school year from after school to the beginning of school on Friday;
c. Alternate Mondays, when the child has not been with the mother for the weekend from after school to 7:00 p. m.
Major holidays, special days and vacations shall supersede the regular schedule, as follows:
d. Major holidays (assigned to defendant)
 1. Easter weekend in odd-numbered years, from 9:00 a.m. on Friday until 7:00 p. m. on Sunday;
2. Memorial day in odd-numbered years, from 9:00 a.m. until 7:00 p. m.; CT Page 1205
3. Thanksgiving in odd-numbered years, from 6:00 p. m. on Wednesday until 7:00 p. m. on Sunday;
4. Christmas Eve in even-numbered years from 3:00 p. m. on Christmas Eve until 9:00 a.m. on Christmas Day;
5. Christmas Day in odd-numbered years from 9:00 a.m. on Christmas Day until 9:00 a.m. on the day after Christmas.
Special Days (assigned to defendant)
 1. New Year's Day in odd-numbered years from 9:00 a.m. until 7:00 p. m.;
2. Halloween in odd-numbered years from after school to 8:30 p. m.;
3. Mother's Day and the defendant's birthday, from 9:00 a.m. to 7:00 p. m.;
4. Child shall spend Father's Day and plaintiff's birthday with the plaintiff;
5. The child's birthday, in even-numbered years, from after school (noon if no school) until 7:00 p. m. In odd-numbered years from after school to 5:00 p. m.
E. School Vacations
 1. The first 14 days of every July and August, commencing at 9:00 a.m. and ending at 7:00 p. m.;
2. Winter school vacation and spring school vacations shall be alternated between the parents annually, with the defendant having the first vacation in 1998, from 9:00 a.m. on the first day until 7:00 p. m. on the last day. The court is aware that there is only one school vacation in 1998. In future years, the parents shall alternate the vacations, with the plaintiff having the winter vacation in 1999;
3. Christmas school vacation days, other than Christmas Eve/Day and New Year's Day shall be shared equally. In the odd-numbered years, the defendant shall have the first half of the vacation period, commencing at 6:00 p. m. on the last day CT Page 1206 of school before Christmas until 7:00 p. m. on the day which is half-way between the first day and the day before school begins, excluding Christmas Day and New Year's Day.
F. General Principles.
 1. The parent whose time with the child is starting shall pick up her from the other parent's home if she is not beginning the period with that parent from after school.
2. Parent and child shall have free access and unhampered contact between them when the child is with the other parent at reasonable times and with reasonable frequency, by telephone and by written communications. Both parents shall know the address and telephone number where the child can be reached at all reasonable hours.
3. Minor adjustments to times/schedules shall be made by agreement of the parties to accommodate changes in work schedules, important family events such as weddings, funerals, wakes, baptisms, etc. which Kelsey shall be allowed to attend with the parent whose family is involved. The parent desiring a change shall state his or her request and the reason for it in writing, and the other party shall respond in writing within forty-eight (48) hours of receipt. Requests for changes in the weekend schedule shall be made as soon as the event becomes known, with a period of at least fourteen (14) days in advance being preferable whenever possible. For a weekday or night change, a request of at least seven (7) days in advance is preferable whenever possible. A party giving up time with Kelsey to accommodate a request shall receive compensatory time.
4. If the plaintiff contemplates moving out of the state of Connecticut or more than 25 miles from his present residence during the child's minority, he shall give the defendant written notice at least ninety (90) days in advance of such move.
5. The plaintiff shall list the defendant's telephone and address on all emergency forms and shall assure that every school, extra-curricular activity, social group, medical person or service, teacher, school, religious group or any other person or activity involved with the child give equal information to both parents. CT Page 1207
FINANCIAL ORDERS
1. Alimony.
Currently, the plaintiff is unemployed. During the marriage he worked in the commercial real estate field specializing in development financing and asset acquisition and management services. He operated as an employee, and also was self-employed for a number of years. Between 1994 and early 1995, the plaintiff lost an exclusive client and since then reduced his pursuing of employment or business opportunities. The reasons offered by the plaintiff for not working are the time required to prepare for this dissolution action prevented him from seeking business opportunities and also he anticipated having to spend substantial time as a parent.
Clearly, the plaintiff's unemployment is as a result of his decision that he had other priorities to attend to. Since he had sufficient assets to survive, he voluntarily ceased working. It is appropriate, therefore, that the court consider the plaintiff's earning capacity in determining a proper alimony award. Miller v. Miller, 181 Conn. 610 (1980); Hart v. Hart,19 Conn. App. 91 (1989).
John Oler, a commercial real estate investment consultant, testified that the plaintiff has impressive credentials in the commercial real estate field, and the current market is excellent. The witness did admit that lack of contacts is an impediment.
It appears to the court that the plaintiff has the intelligence, skills, track record and reputation to resume his career. Concededly, some time may be required to rekindle contacts or discover new ones.
Although, due to the nature of the industry, measuring the plaintiff's current earning capacity is difficult, the following information is noted. The plaintiff earned an average income of $590,000, per year while employed at Eastdil during the years 1983-1985. He earned an average annual income of $240,000 while a member of the Wells Hill partnership for the years 1986-1990. For the ten year period between 1986 and 1995, the plaintiff earned approximately $2,000,000. The court finds the plaintiff's earning capacity to be approximately $200,000 per year. CT Page 1208
a. The plaintiff shall pay to the defendant as periodic alimony the sum of $6,000 per month. The payments shall commence on January 1, 1998 and continue on the first day of each month thereafter, payable in advance, until the death of either party, the plaintiff's remarriage or December 31, 2002, (a period of five years), whichever first occurs. The TERM of alimony shall not be subject to modification, except in accordance with section46b-86(b) of the General Statutes. A contingent wage withholding order may enter.
The court, after consideration of the criteria included in section 46b-82 of the General Statutes, has concluded that a five year term of periodic alimony is appropriate. The defendant has an impressive educational background and has demonstrated talent in a variety of areas. During the next few years she can hone her skills, if she desires, continue her education and pursue opportunities in several fields of work. Also, the court has considered the property distribution awarded to the defendant. She should have some security and return from prudent investment of the assets she is receiving.
b. As security for the alimony awarded, the plaintiff shall maintain the defendant the beneficiary of life insurance having a net benefit in the event of the plaintiff's death of $100,000, for as long as the plaintiff is obligated to pay periodic alimony. The plaintiff shall furnish the defendant proof of such coverage.
2. Child Support and other Obligations for the Child
 a. The court has considered the criteria in section46b-84 of the General Statutes. Under the current circumstances, the defendant shall have no obligation to pay child support to the plaintiff.
b. The parties shall maintain the existing medical insurances for the benefit of Kelsey. The defendant shall pay for the medical insurance at Starbuck's as long as it is available to her. If the insurance becomes unavailable to the defendant through her employment, either by her leaving Starbuck's or any change in her employment benefits, then the plaintiff shall be responsible for maintaining medical insurance benefits for his daughter. The plaintiff shall continue to provide major medical insurance for Kelsey. The plaintiff shall be responsible for and pay all of Kelsey's unreimbursed medical CT Page 1209 expenses, including but not limited to hospitalization, psychological or other therapy, dental or orthodontic, except that the plaintiff shall have no responsibility for any non-emergency expenses incurred by the defendant without the plaintiff's prior express written approval. Section 46b-84(d) of the General Statutes shall apply.
c. The plaintiff shall be the sole trustee of the Kelsey McManus Trust. The defendant shall resign as co-trustee and execute all documents required to implement this order.
The court orders the plaintiff to keep the defendant informed of his plans for use of this college education fund and afford the defendant the opportunity to express her opinions as to its use, and the plaintiff shall consider the defendant's views before final decisions are made by him.
d. The fees of Sheila Rosenstein shall be promptly paid within thirty days of this order. The total bill was $107,600. The plaintiff shall be responsible for seventy-five (75%) percent of the bill, and the defendant for twenty-five (25%) percent. Each shall receive credit for payments made.
3. Property Division
The court has carefully considered the criteria set forth in General Statutes sections 46b-62, 46b-81 and 46b-82 in reaching the decisions reflected in the orders that follow.
a. The plaintiff shall promptly quitclaim all his right, title and interest in the jointly owned marital residence located at 210 Rivergate Drive, Wilton, Connecticut to the defendant. The transfer shall be subject to the existing mortgage which the defendant shall assume and pay, and the defendant shall indemnify and hold the plaintiff harmless from all liability thereon.
Each party presented a real estate appraiser to establish the value of the residence. The evidence indicates that the property has been neglected, and some repairs are required to restore it to a condition that would be attractive to potential buyers.
From the appraisal of $460,000 submitted by the plaintiff, some further reduction in value is required to provide for the necessary repairs. The court understands that the CT Page 1210 plaintiff's appraiser took the condition of the premises into consideration, but the court finds that he was too conservative with his result. The court finds the fair market value of the residence to be $420,000.
Another substantial asset of the parties is stock owned in a company known as FlexiInternational Software, Inc. The plaintiff holds, in his own name, several thousand shares of both common and preferred stock. At the commencement of this trial the company was privately owned but was attempting to be offered to the public, and it was working with underwriters with that goal in mind as the trial was progressing.
Shortly before the evidence was concluded in this case, FlexiInternational completed its plans with underwriters and the stock went public. This clarified somewhat the value of the plaintiff's interest in this investment. However, because of stock restrictions, the plaintiff will be unable to trade for a period of six months, perhaps all or at least some of the shares he lists on his financial affidavit. For various reasons testified to by the plaintiff, he has reduced the present value of his remaining shares because of the six month restriction on trading.
Before arriving at a decision on property division, the court has taken into consideration, among all the statutory criteria, the value of the assets the plaintiff brought into the marriage. It also has recognized that the remaining FlexiInternational stocks are subject to some risks because of the restriction and the vagaries of the stock market. The court has concluded, however, that after factoring in all the criteria that its division of the assets would not be altered if the court accepted the discounted figure used by the plaintiff or rejected his reduced value.
b. As additional property division, the plaintiff shall pay to the defendant the sum of eight hundred thousand ($800,000) dollars by February 16, 1998.
c. The plaintiff shall transfer ownership of the Saab 9000 Turbo to the defendant. The defendant shall retain her interest in the 1997 Ford Explorer.
d. The defendant shall retain ownership in the following accounts which are held in her name alone: CT Page 1211
1. Dreyfus Banking Account;
2. Lafayette American Bank;
3. Fidelity Investment Account;
4. Charles Schwab Brokerage Account;
5. Fidelity IRA;
6. Lafayette American Bank IRAs.
e. The plaintiff shall retain ownership in the checking, savings, money market and retirement accounts scheduled on pages 5 and 6 of his financial affidavit dated December 17, 1997.
f. The plaintiff is awarded the following assets:
 1. All the common and preferred stock in FlexiInternational Software, Inc.;
 2. The entire interest in ATA Research/Profutures Diversified Investment Partnership;
 3. The entire interest in ERI Associates Real Estate Partnership;
 4. The security deposit and pre-paid rent on 37 Glen Ridge Road, Wilton;
5. The 1983 25' Pursuit motor boat;
6. The 1992 Lexus SC400.
g. The issue of division of personal property consisting of the contents of the marital residence, the items stored in the Wilson properties storage unit, and the OAM furnishings and equipment was not addressed at trial. The court reserves jurisdiction over the distribution of these assets if the parties are unable to settle it between themselves.
If assistance is required, the parties are invited to use the services of the Family Relations office at Bridgeport or CT Page 1212 private binding arbitration by a person jointly selected. If they require court intervention, a future hearing will be assigned to resolve the matter.
4. Liabilities
 a. Each party shall be responsible for and pay his or her own counsel fees.
b. Doctor Steven Sichel fees for his services totalled $19,300. Each party is responsible for half of the bill. The plaintiff has paid $8,650 and owes a balance of $1,000 for his share. The defendant has paid $5,500 and owes a balance of $4,150. Each shall pay his remaining share promptly to the doctor.
c. Except as herein provided, each party shall be responsible for the liabilities set forth on his or her financial affidavit, and indemnify and hold the other harmless from any liability thereon. The plaintiff's affidavit is dated December 17, 1997, and the defendant's affidavit is dated October 15, 1997 and amended on December 16, 1997.
d. The defendant has requested reimbursement from the plaintiff for funds disbursed by the defendant for home repairs, for mortgage payments, for medical expenses for the defendant and minor child and for all legal fees and expenses incurred since August 1, 1995. She also has requested payments to replace household appliances, for required repairs, for a new automobile, and for repayment of funds used by the plaintiff to terminate his interest in an investment. All of these requests have been taken into consideration before making the allocation of assets. Also, it is significant to note that by a pendente lite order entered by stipulation, each party had the use of approximately $300,000 to cover many of the expenses that make up part of the defendant's claims.
The escrow funds held by Marvin and Ferro, in the approximate amount of $7,200 shall be released to the plaintiff.
e. If the parties agree to file joint income tax returns for the years 1995 through 1997 they may do so, and the plaintiff shall be solely responsible for any taxes and interest due and shall be entitled to any refunds. If they do not file joint returns, then the plaintiff may retain the IRS refund received CT Page 1213 and keep the Connecticut tax refund when received.
Judgment may enter accordingly.
NOVACK, J.